## STANDARD OIL CO. *v.* FEDERAL TRADE COMMISSION.

No. 1.   Argued January 9–10, 1950.—Reargued October 9, 1950.—
Decided January 8, 1951.

232

*Howard Ellis* argued the cause for petitioner. With him on the brief were *Weymouth Kirkland, Hammond E. Chaffetz, W. H. Van Oosterhout, Arthur J. Abbott, Thomas E. Sunderland* and *Gordon E. Tappan.*

By special leave of Court, *William Simon* argüed the cause and filed a brief for the Empire State Petroleum Association, Inc. et al., as *amici curiae,* urging reversal.

*James W. Cassedy* argued the cause for respondent. With him on the brief was *W. T. Kelley.*

By special leave of Court, *Cyrus Austin* argued the cause and filed a brief for the Retail Gasoline Dealers Association of Michigan, Inc. et al., as *amici curiae,* urging affirmance.

*Raoul Berger* filed a brief for the Citrin-Kolb Oil Company, as *amicus curiae,* urging reversal.

MR. JUSTICE BURTON delivered the opinion of the Court.

In this case the Federal Trade Commission challenged the right of the Standard Oil Company, under the Rob-

inson-Patman Act,[1] to sell gasoline to four comparatively large "jobber" customers in Detroit at a less price per gallon than it sold like gasoline to many comparatively small service station customers in the same area. The company's defenses were that (1) the sales involved were not in interstate commerce and (2) its lower price to the jobbers was justified because made to retain them as customers and in good faith to meet an equally low price of a competitor.[2]  The Commission, with one member dissenting, ordered the company to cease and desist from making such a price differential.  43 F. T. C. 56.  The Court of Appeals slightly modified the order and required its enforcement as modified.  173 F. 2d 210.  We granted certiorari on petition of the company because the case presents an important issue under the Robinson-Patman Act which has not been settled by this Court.  338 U. S. 865.  The case was argued at our October Term, 1949, and reargued at this term.  339 U. S. 975.

For the reasons hereinafter stated, we agree with the court below that the sales were made in interstate commerce but we agree with petitioner that, under the Act, the lower price to the jobbers was justified if it was made to retain each of them as a customer and in good faith to meet an equally low price of a competitor.

## I. FACTS.

Reserving for separate consideration the facts determining the issue of interstate commerce, the other material

---

[1] Specifically under § 2 of the Clayton Act, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13.  For the material text of § 2 (a) and (b) see pp. 242–243, *infra*.

[2] The company contended before the Commission that the price differential allowed by it to the jobbers made only due allowance for differences in the cost of sale and delivery of gasoline to them. It did not, however, pursue this defense in the court below and does not do so here.

facts are summarized here on the basis of the Commission's findings. The sales described are those of Red Crown gasoline because those sales raise all of the material issues and constitute about 90% of petitioner's sales in the Detroit area.

Since the effective date of the Robinson-Patman Act, June 19, 1936, petitioner has sold its Red Crown gasoline to its "jobber" customers at its tank-car prices. Those prices have been 1½¢ per gallon less than its tank-wagon prices to service station customers for identical gasoline in the same area. In practice, the service stations have resold the gasoline at the prevailing retail service station prices.[3] Each of petitioner's so-called "jobber" customers has been free to resell its gasoline at retail or wholesale. Each, at some time, has resold some of it at retail. One now resells it only at retail. The others now resell it largely at wholesale. As to resale prices, two of the "jobbers" have resold their gasoline only at the prevailing wholesale or retail rates. The other two, however, have reflected, in varying degrees, petitioner's reductions in the cost of the gasoline to them by reducing their resale prices of that gasoline below the prevailing rates. The effect of these reductions has thus reached competing retail service stations in part through retail stations operated by the "jobbers" and in part through retail stations which purchased gasoline from the "jobbers" at less than the prevailing tank-wagon prices. The Commission found that such reduced resale prices "have resulted in injuring, destroying, and preventing competition between said favored dealers and retail dealers in respondent's [petitioner's] gasoline and other major brands of gasoline . . . ." 41 F. T. C. 263, 283. The distinctive

---

[3] About 150 of these stations are owned or leased by the customers independently of petitioner. Their operators buy all of their gasoline from petitioner under short-term agreements. The other 208 stations are leased or subleased from petitioner for short terms.

characteristics of these "jobbers" are that each (1) maintains sufficient bulk storage to take delivery of gasoline in tank-car quantities (of 8,000 to 12,000 gallons) rather than in tank-wagon quantities (of 700 to 800 gallons) as is customary for service stations; (2) owns and operates tank wagons and other facilities for delivery of gasoline to service stations; (3) has an established business sufficient to insure purchases of from one to two million gallons a year; and (4) has adequate credit responsibility.[4] While the cost of petitioner's sales and deliveries of gasoline to each of these four "jobbers" is no doubt less, per gallon, than the cost of its sales and deliveries of like gasoline to its service station customers in the same area, there is no finding that such difference accounts for the entire reduction in price made by petitioner to these "jobbers," and we proceed on the assumption that it does not entirely account for that difference.

Petitioner placed its reliance upon evidence offered to show that its lower price to each jobber was made in order to retain that jobber as a customer and in good faith to meet an equally low price offered by one or more competitors. The Commission, however, treated such evidence as not relevant.

II. THE SALES WERE MADE IN INTERSTATE COMMERCE.

In order for the sales here involved to come under the Clayton Act, as amended by the Robinson-Patman Act,

---

[4] Not denying the established industry practice of recognizing such dealers as a distinctive group for operational convenience, the Commission held that petitioner's classification of these four dealers as "jobbers" was arbitrary because it made "no requirement that said jobbers should sell only at wholesale." 41 F. T. C. at 273. We use the term "jobber" in this opinion merely as one of convenience and identification, because the result here is the same whether these four dealers are wholesalers or retailers.

they must have been made in interstate commerce.[5]  The
Commission and the court below agree that the sales were
so made.    41 F. T. C. 263, 271, 173 F. 2d 210, 213–214.

Facts determining this were found by the Commission
as follows: Petitioner is an Indiana corporation, whose
principal office is in Chicago.   Its gasoline is obtained
from fields in Kansas, Oklahoma, Texas and Wyoming.
Its refining plant is at Whiting, Indiana.   It distributes
its products in 14 middle western states, including Michi-
gan.   The gasoline sold by it in the Detroit, Michigan,
area, and involved in this case, is carried for petitioner by
tankers on the Great Lakes from Indiana to petitioner's
marine terminal at River Rouge, Michigan.   Enough
gasoline is accumulated there during each navigation sea-
son so that a winter's supply.is available from the terminal.
The gasoline remains for varying periods at the terminal
or in nearby bulk storage stations, and while there it is
under the ownership of petitioner and en route from peti-
tioner's refinery in Indiana to its market in Michigan.
"Although the gasoline was not brought to River Rouge
pursuant to orders already taken, the demands of the
Michigan territory were fairly constant, and the petition-
er's customers' demands could be accurately estimated, so
the flow of the stream of commerce kept surging from
Whiting to Detroit."   173 F. 2d at 213–214.   Gasoline
delivered to customers in Detroit, upon individual orders
for it, is taken from the gasoline at the terminal in inter-
state commerce en route for delivery in that area.   Such
sales are well within the jurisdictional requirements of the
Act.   Any other conclusion would fall short of the recog-

---

[5] Section 2 (a) of the Clayton Act, as amended, relates only to
persons "engaged in commerce, in the course of such commerce . . .
where either or any of the purchases involved . . . are in com-
merce . . . ."   49 Stat. 1526, 15 U. S. C. § 13 (a).   "Commerce"
is defined in § 1 of the Clayton Act as including "trade or commerce
among the several States . . . ."   38 Stat. 730, 15 U. S. C. § 12.

nized purpose of the Robinson-Patman Act to reach the operations of large interstate businesses in competition with small local concerns. Such temporary storage of the gasoline as occurs within the Detroit area does not deprive the gasoline of its interstate character. *Stafford* v. *Wallace,* 258 U. S. 495. Compare *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 570, with *Atlantic Coast Line R. Co.* v. *Standard Oil Co.,* 275 U. S. 257, 268.[6]

### III. There Should Be a Finding as to Whether or Not Petitioner's Price Reduction Was Made in Good Faith to Meet a Lawful Equally Low Price of a Competitor.

Petitioner presented evidence tending to prove that its tank-car price was made to each "jobber" in order to retain that "jobber" as a customer and in good faith to meet a lawful and equally low price of a competitor. Petitioner sought to show that it succeeded in retaining these customers, although the tank-car price which it offered them merely approached or matched, and did not undercut, the lower prices offered them by several competitors of petitioner. The trial examiner made findings on the point[7] but the Commission declined to do so, saying:

"Based on the record in this case the Commission concludes as a matter of law that it is not material

---

[6] The Fair Labor Standards Act cases relied on by petitioner are not inconsistent with this result. They hold that, for the purposes of that statute, interstate commerce ceased on delivery to a local distributor. *Higgins* v. *Carr Bros. Co.,* 317 U. S. 572; *Walling* v. *Jacksonville Paper Co., supra.* The sales involved here, on the other hand, are those of an interstate producer and refiner to a local distributor.

[7] The trial examiner concluded:

"The recognition by respondent [petitioner] of Ned's Auto Supply Company as a jobber or wholesaler [which carried with it the tank-car price for gasoline], was a forced recognition given to retain that company's business. Ned's Company at the time of recognition,

whether the discriminations in price granted by the respondent to the said four dealers were made to meet equally low prices of competitors. The Commission further concludes as a matter of law that it is unnecessary for the Commission to determine whether the alleged competitive prices were in fact available or involved gasoline of like grade or quality or of equal public acceptance. Accordingly the Commission does not attempt to find the facts regarding those matters because, even though the lower prices in question may have been made by respondent in good faith to meet the lower prices of competitors, this does not constitute a defense in the face of affirmative proof that the effect of the discrimination was to injure, destroy and prevent competition with the retail stations operated by the said named dealers and with stations operated by their retailer-customers." 41 F. T. C. 263, 281–282.

The court below affirmed the Commission's position.[8] There is no doubt that under the Clayton Act, before its amendment by the Robinson-Patman Act, this evidence would have been material and, if accepted, would have

and ever since, has possessed all qualifications required by respondent [petitioner] for recognition as a jobber and the recognition was given and has ever since been continued in transactions between the parties, believed by them to be bona fide in all respects . . . ." (Conclusion of Fact 2, under § IX, R. 5098–5099.)

"The differentials on its branded gasolines respondent [petitioner] granted Ned's Auto Supply Company, at all times subsequent to March 7, 1938, and Stikeman Oil Company, Citrin-Kolb Oil Company and the Wayne Company [the four jobbers], at all times subsequent to June 19, 1936, were granted to meet equally low prices offered by competitors on branded gasolines of comparable grade and quality." (Conclusion of Fact, under § X, R. 5104.)

[8] "Now as to the contention that the discriminatory prices here complained of were made in good faith to meet a lower price of a competitor. While the Commission made no finding on this point,

established a complete defense to the charge of unlawful discrimination. At that time the material provisions of § 2 were as follows:

"SEC. 2. That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities . . . where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: *Provided, That nothing herein contained shall prevent* discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or *discrimination in price in the same or different communities made in good faith to meet competition: And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade." (Emphasis added within the first proviso.) 38 Stat. 730–731, 15 U. S. C. (1934 ed.) § 13.

The question before us, therefore, is whether the amendments made by the Robinson-Patman Act deprived those facts of their previously recognized effectiveness as a defense. The material provisions of § 2, as amended, are

it assumed its existence but held, contrary to the petitioner's contention, that this was not a defense.

. . . . .

"We agree with the Commission that the showing of the petitioner that it made the discriminatory price in good faith to meet competition is not controlling in view of the very substantial evidence that its discrimination was used to affect and lessen competition at the retail level." 173 F. 2d at 214, 217.

quoted below, showing in italics those clauses which bear upon the proviso before us. The modified provisions are distributed between the newly created subsections (a) and (b). These must be read together and in relation to the provisions they supersede. The original phrase "that nothing herein contained shall prevent" is still used to introduce each of the defenses. The defense relating to the meeting of the price of a competitor appears only in subsection (b). There it is applied to discriminations in services or facilities as well as to discriminations in price, which alone are expressly condemned in subsection (a). In its opinion in the instant case, the Commission recognizes that it is an absolute defense to a charge of price discrimination for a seller to prove, under § 2 (a), that its price differential makes only due allowances for differences in cost or for price changes made in response to changing market conditions. 41 F. T. C. at 283. Each of these three defenses is introduced by the same phrase "nothing . . . shall prevent," and all are embraced in the same word "justification" in the first sentence of § 2 (b). It is natural, therefore, to conclude that each of these defenses is entitled to the same effect, without regard to whether there also appears an affirmative showing of actual or potential injury to competition at the same or a lower level traceable to the price differential made by the seller. The Commission says, however, that the proviso in § 2 (b) as to a seller meeting in good faith a lower competitive price is not an absolute defense if an injury to competition may result from such price reduction. We find no basis for such a distinction between the defenses in § 2 (a) and (b).

The defense in subsection (b), now before us, is limited to a price reduction made to meet in good faith an equally low price of a competitor. It thus eliminates certain difficulties which arose under the original Clayton Act. For example, it omits reference to discriminations in price "in

the same or different communities . . ." and it thus restricts the proviso to price differentials occurring in actual competition.   It also excludes reductions which undercut the "lower price" of a competitor.   None of these changes, however, cut into the actual core of the defense.   That still consists of the provision that wherever a lawful lower price of a competitor threatens to deprive a seller of a customer, the seller, to retain that customer, may in good faith meet that lower price.   Actual competition, at least in this elemental form, is thus preserved.

Subsections 2 (a) and (b), as amended, are as follows:

"Sɛc. 2.  (a) That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided, That nothing herein contained shall prevent* differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: . . . *And provided further, That nothing herein contained shall prevent* price changes from time to time . . . in response to changing conditions affecting the market for or the marketability of the goods concerned . . . .

"(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, *the burden of rebutting the prima-facie case thus*

*made by showing justification* shall be upon the person charged with a violation of this section, and *unless justification shall be affirmatively shown,* the Commission is authorized to issue an order terminating the discrimination: *Provided, however, That nothing herein contained shall prevent* a seller rebutting the prima-facie case thus made by *showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."* (Emphasis added in part.) 49 Stat. 1526, 15 U. S. C. § 13 (a) and (b).

This right of a seller, under § 2 (b), to meet in good faith an equally low price of a competitor has been considered here before. Both in *Corn Products Refining Co.* v. *Federal Trade Comm'n,* 324 U. S. 726, and in *Federal Trade Comm'n* v. *Staley Mfg. Co.,* 324 U. S. 746, evidence in support of this defense was reviewed at length. There would have been no occasion thus to review it under the theory now contended for by the Commission. While this Court did not sustain the seller's defense in either case, it did unquestionably recognize the relevance of the evidence in support of that defense. The decision in each case was based upon the insufficiency of the seller's evidence to establish its defense, not upon the inadequacy of its defense as a matter of law.[9]

In the *Corn Products* case, *supra,* after recognizing that the seller had allowed differentials in price in favor of certain customers, this Court examined the evidence presented by the seller to show that such differentials were

---

[9] In contrast to that factual situation, the trial examiner for the Commission in the instant case has found the necessary facts to sustain the seller's defense (see note 7, *supra*), and yet the Commission refuses, as a matter of law, to give them consideration.

justified because made in good faith to meet equally low prices of a competitor. It then said:

> "Examination of the *testimony* satisfies us, as it did the court below, that it *was insufficient* to sustain a finding that the lower prices allowed to favored customers were in fact made to meet competition. Hence petitioners *failed to sustain the burden* of showing that the price discriminations were granted for the purpose of meeting competition." (Emphasis added.) 324 U. S. at 741.[10]

In the *Staley* case, *supra,* most of the Court's opinion is devoted to the consideration of the evidence introduced in support of the seller's defense under § 2 (b). The discussion proceeds upon the assumption, applicable here, that if a competitor's "lower price" is a lawful individual price offered to any of the seller's customers, then the seller is protected, under § 2 (b), in making a counteroffer provided the seller proves that its counteroffer is made to meet in good faith its competitor's equally low price. On the record in the *Staley* case, a majority of the Court of Appeals, in fact, declined to accept the findings of the Commission and decided in favor of the accused seller.[11] This Court, on review, reversed that judgment

---

[10] In the *Corn Products* case, the same point of view was expressed by the Court of Appeals below: "We think the evidence is insufficient to sustain this affirmative defence." 144 F. 2d 211, 217 (C. A. 7th Cir.). The Court of Appeals also indicated that, to sustain this defense, it must appear not only that the competitor's lower price was met in good faith but that such price was lawful.

[11] The *Staley* case was twice before the Court of Appeals for the Seventh Circuit. In 1943 the case was remanded by that court to the Commission for findings as to wherein the discriminations occurred and how they substantially lessened competition and promoted monopoly and also "for consideration of the defense [under § 2 (b)] urged by the petitioners, and for findings in relation thereto." 135 F. 2d 453, 456. In 1944, a majority of the court decided in favor of the seller. 144 F. 2d 221. One judge held that the complaint

but emphatically recognized the availability of the seller's defense under § 2 (b) and the obligation of the Commission to make findings upon issues material to that defense. It said:

> "Congress has left to the Commission the determination of fact in each case whether the person, charged with making discriminatory prices, acted in good faith to meet a competitor's equally low prices. The determination of this fact from the evidence is for the Commission. See *Federal Trade Commission* v. *Pacific States Paper Trade Assn.,* 273 U. S. 52, 63; *Federal Trade Commission* v. *Algoma Lumber Co.,* 291 U. S. 67, 73. In the present case, the Commission's finding that respondents' price discriminations were not made to meet a 'lower' price and consequently were not in good faith, is amply supported by the record, and we think the Court of Appeals erred in setting aside this portion of the Commission's order to cease and desist.

> •    •    •    •    •

> "In appraising the evidence, the Commission recognized that the statute does not place an impossible burden upon sellers, but it emphasized the good faith requirement of the statute, which places the burden

was insufficient under § 2 (a) and that, therefore, he need not reach the seller's defense under § 2 (b). He expressly stated, however, that he did not take issue with the basis for the conclusion that the seller's price was made in good faith to meet an equally low price of a competitor. *Id.,* at 227–231. His colleague held squarely that the seller's defense of meeting competition in good faith under § 2 (b) had been established. *Id.,* at 221–225. The third judge found against the seller both under § 2 (a) and (b). *Id.,* at 225–227. The important point for us is that the Court of Appeals, as well as this Court, unanimously recognized in that case the materiality of the seller's evidence in support of its defense under § 2 (b), even though the "discriminations 'have resulted, and do result, in substantial injury to competition among purchasers . . . .' " *Id.,* at 222.

of proving good faith on the seller, who has made the discriminatory prices. . . .

". . . We agree with the Commission that the statute at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor. Nor was the Commission wrong in holding that respondents failed to meet this burden." 324 U. S. at 758, 759–760.

See also, *Federal Trade Comm'n* v. *Cement Institute,* 333 U. S. 683, 721–726; *Federal Trade Comm'n* v. *Morton Salt Co.,* 334 U. S. 37, 43; and *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 92. All that petitioner asks in the instant case is that its evidence be considered and that findings be made by the Commission as to the sufficiency of that evidence to support petitioner's defense under § 2 (b).

In addition, there has been widespread understanding that, under the Robinson-Patman Act, it is a complete defense to a charge of price discrimination for the seller to show that its price differential has been made in good faith to meet a lawful and equally low price of a competitor. This understanding is reflected in actions and statements of members and counsel of the Federal Trade Commission.[12] Representatives of the Department of

---

[12] In cease and desist orders, issued both before and after the order in the instant case, the Commission has inserted saving clauses which recognize the propriety of a seller making a price reduction in good faith to meet an equally low price of a competitor, even though the seller's discrimination may have the effect of injuring competition at a lower level. See *In re Ferro Enamel Corp.,* 42 F. T. C. 36; *In re Anheuser-Busch, Inc.,* 31 F. T. C. 986; *In re Bausch & Lomb Optical Co.,* 28 F. T. C. 186.

See also, the statement filed by Walter B. Wooden, Assistant Chief

Justice have testified to the effectiveness and value of the defense under the Robinson-Patman Act.[13] We see no reason to depart now from that interpretation.[14]

Counsel, and by Hugh E. White, Examiner for the Commission, with the Temporary National Economic Committee in 1941:

"The amended Act now safeguards the right of a seller to discriminate in price in good faith to meet an equally low price of a competitor, but he has the burden of proof on that question. This right is guaranteed by statute and could not be curtailed by any mandate or order of the Commission. . . . The right of self defense against competitive price attacks is as vital in a competitive economy as the right of self defense against personal attack." The Basing Point Problem 139 (TNEC Monograph 42, 1941).

In regard to the Commission's position on § 2 (b), urged in the instant case, Allen C. Phelps, Assistant Chief Trial Counsel and Chief of the Export Trade Division of the Commission, testified before the Subcommittee on Trade Policies of the Senate Committee on Interstate and Foreign Commerce in January, 1949, that "This position, if upheld in the courts, in my judgment will effectively and completely erase section 2 (b) from the Robinson-Patman Act." Hearings before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S. 236, 81st Cong., 1st Sess. 66. See also, pp. 274–275.

[13] Herbert A. Bergson, then Assistant Attorney General, testifying for the Department, January 25, 1949, said: "The section [2 (b)] presently permits sellers to justify otherwise forbidden price discriminations on the ground that the lower prices to one set of buyers were made in good faith to meet the equally low prices of a competitor." Hearings before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S. 236, 81st Cong., 1st Sess. 77. See also, report on S. 236 by Peyton Ford, The Assistant to the Attorney General, to the Senate Committee on Interstate and Foreign Commerce. Id., at 320. Mr. Bergson added the following in June, 1949: "While we recognize the competitive problem which arises when one purchaser obtains advantages denied to other purchasers, we do not believe the solution to this problem lies in denying to sellers the opportunity to make sales in good faith competition with other sellers." Hearings before Subcommittee No. 1 of the House Committee on the Judiciary on S. 1008, 81st Cong., 1st Sess. 12.

[14] Attention has been directed again to the legislative history of the proviso. This was considered in the *Corn Products* and *Staley*

The heart of our national economic policy long has been faith in the value of competition. In the Sherman and Clayton Acts, as well as in the Robinson-Patman Act,

---

cases. See especially, 324 U. S. at 752–753. We find that the legislative history, at best, is inconclusive. It indicates that it was the purpose of Congress to limit, but not to abolish, the essence of the defense recognized as absolute in § 2 of the original Clayton Act, 38 Stat. 730, where a seller's reduction in price had been made "in good faith to meet competition . . . ." For example, the legislative history recognizes that the Robinson-Patman Act limits that defense to price differentials that do not undercut the competitor's price, and the amendments fail to protect differentials between prices in different communities where those prices are not actually competitive. There is also a suggestion in the debates, as well as in the remarks of this Court in the *Staley* case, *supra*, that a competitor's lower price, which may be met by a seller under the protection of § 2 (b), must be a lawful price. And see, S. Res. 224, 70th Cong., 1st Sess., directing the Federal Trade Commission to investigate and report to it on chain-store operators and F. T. C. Final Report on the Chain-Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess.

In the report of the Judiciary Committee of the House of Representatives, which drafted the clause which became § 2 (b), there appears the following explanation of it:

"This proviso represents a contraction of an exemption now contained in section 2 of the Clayton Act which permits discriminations without limit where made in good faith to meet competition. It should be noted that while the seller is permitted to meet local competition, it does not permit him to cut local prices until his competitor has first offered lower prices, and then he can go no further than to meet those prices. If he goes further, he must do so likewise with all his other customers, or make himself liable to all of the penalties of the act, including treble damages. In other words, the proviso permits the seller to meet the price actually previously offered by a local competitor. It permits him to go no further." H. R. Rep. No. 2287, 74th Cong., 2d Sess. 16.

See also, 80 Cong. Rec. 6426, 6431–6436, 8229, 8235.

Somewhat changing this emphasis, there was a statement made by the managers on the part of the House of Representatives, accompanying the conference report, which said that the new clause was a "provision relating to the question of meeting competition, intended to operate only as a rule of evidence in a proceeding before the

"Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent." *Staley Mfg. Co.* v. *Federal Trade Comm'n,* 135 F. 2d 453, 455. We need not now reconcile, in its entirety, the economic theory which underlies the Robinson-Patman Act with that of the Sherman and Clayton Acts.[15] It is enough to say that Congress did not seek by the Robinson-Patman Act either to abolish competition or so radically to curtail it that a seller would have no substantial right of self-defense against a price raid by a competitor. For example, if a large customer requests his seller to meet a temptingly lower price offered to him by one of his seller's competitors, the seller may well find it essential, as a matter of business survival, to meet that price rather than to lose the customer. It might be that this customer is the seller's only available market for the major portion of the seller's product, and that the loss of this customer would result in forcing a much higher unit cost and higher sales price upon the seller's other custom-

Federal Trade Commission . . . ." H. R. Rep. No. 2951, 74th Cong., 2d Sess. 7. The Chairman of the House Conferees also received permission to print in the Record an explanation of the proviso. 80 Cong. Rec. 9418. This explanation emphasizes the same interpretation as that put on the proviso in the *Staley* case to the effect that the lower price which lawfully may be met by a seller must be a lawful price. That statement, however, neither justifies disregarding the proviso nor failing to make findings of fact where evidence is offered that the prices met by the seller are lawful prices and that the meeting of them is in good faith.

[15] It has been suggested that, in theory, the Robinson-Patman Act as a whole is inconsistent with the Sherman and Clayton Acts. See Adelman, Effective Competition and the Antitrust Laws, 61 Harv. L. Rev. 1289, 1327–1350; Burns, The Anti-Trust Laws and the Regulation of Price Competition, 4 Law & Contemp. Prob. 301; Learned & Isaacs, The Robinson-Patman Law: Some Assumptions and Expectations, 15 Harv. Bus. Rev. 137; McAllister, Price Control by Law in the United States: A Survey, 4 Law & Contemp. Prob. 273.

ers. There is nothing to show a congressional purpose, in such a situation, to compel the seller to choose only between ruinously cutting its prices to all its customers to match the price offered to one, or refusing to meet the competition and then ruinously raising its prices to its remaining customers to cover increased unit costs. There is, on the other hand, plain language and established practice which permits a seller, through § 2 (b), to retain a customer by realistically meeting in good faith the price offered to that customer, without necessarily changing the seller's price to its other customers.

In a case where a seller sustains the burden of proof placed upon it to establish its defense under § 2 (b), we find no reason to destroy that defense indirectly, merely because it also appears that the beneficiaries of the seller's price reductions may derive a competitive advantage from them or may, in a natural course of events, reduce their own resale prices to their customers. It must have been obvious to Congress that any price reduction to any dealer may always affect competition at that dealer's level as well as at the dealer's resale level, whether or not the reduction to the dealer is discriminatory. Likewise, it must have been obvious to Congress that any price reductions initiated by a seller's competitor would, if not met by the seller, affect competition at the beneficiary's level or among the beneficiary's customers just as much as if those reductions had been met by the seller. The proviso in § 2 (b), as interpreted by the Commission, would not be available when there was or might be an injury to competition at a resale level. So interpreted, the proviso would have such little, if any, applicability as to be practically meaningless. We may, therefore, conclude that Congress meant to permit the natural consequences to follow the seller's action in meeting in good faith a lawful and equally low price of its competitor.

In its argument here, the Commission suggests that there may be some situations in which it might recognize

the proviso in § 2 (b) as a complete defense, even though the seller's differential in price did injure competition. In support of this, the Commission indicates that in each case it must weigh the potentially injurious effect of a seller's price reduction upon competition at all lower levels against its beneficial effect in permitting the seller to meet competition at its own level. In the absence of more explicit requirements and more specific standards of comparison than we have here, it is difficult to see how an injury to competition at a level below that of the seller can thus be balanced fairly against a justification for meeting the competition at the seller's level. We hesitate to accept § 2 (b) as establishing such a dubious defense. On the other hand, the proviso is readily understandable as simply continuing in effect a defense which is equally absolute, but more limited in scope than that which existed under § 2 of the original Clayton Act.

The judgment of the Court of Appeals, accordingly, is reversed and the case is remanded to that court with instructions to remand it to the Federal Trade Commission to make findings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE MINTON took no part in the consideration or decision of this case.

MR. JUSTICE REED, dissenting.*

The Federal Trade Commission investigated practices of the Standard Oil Company of Indiana in selling its gasoline in the Detroit area at different prices to competing local distributors, in alleged violation of the Robinson-Patman (anti-price discrimination) Act. Standard's defense is not a denial of that discriminatory practice but a complete justification, said to be allowed by the

---

*[Joined by THE CHIEF JUSTICE and MR. JUSTICE BLACK. See *post*, p. 267.]

Robinson-Patman Act, on the ground of trade necessity in order to meet an equally low price in Detroit of other gasoline refiners. On concluding that the practice violated federal prohibitions against discriminatory sale prices, the Commission entered a cease and desist order against Standard's sale system. The order was enforced by the Court of Appeals after a minor modification. 43 F. T. C. 56; 173 F. 2d 210.

The need to allow sellers to meet competition in price from other sellers while protecting the competitors of the buyers against the buyers' advantages gained from the price discrimination was a major cause of the enactment of the 1936 Robinson-Patman Act. The Clayton Act of 1914 had failed to solve the problem. The impossibility of drafting fixed words of a statute so as to allow sufficient flexibility to meet the myriad situations of national commerce, we think led Congress in the Robinson-Patman Act to put authority in the Federal Trade Commission to determine when a seller's discriminatory sales price violated the prohibitions of the anti-monopoly statute, § 2 (a), 49 Stat. 1526, and when it was justified by a competitor's legal price.[1] The disadvantage to business of this choice was that the seller could not be positive before the Commission acted as to precisely how far he might go in price discrimination to meet and beat his competition. The Commission acted on its interpretation of the Act.[2] Believing it important to support the purpose of Congress and the Commission's interpretation of the Act, with which we agree, we state our reasons.

---

[1] The difficulties of any other approach are illustrated by the attempt of Congress to clarify the Robinson-Patman Act. See President's veto message on S. 1008, 96 Cong. Rec. 8721, and conference reports, H. R. Rep. No. 1422, 81st Cong., 1st Sess., October 13, 1949, and 2d Sess., H. R. Rep. No. 1730, March 3, 1950.

[2] Hearings before Subcommittee No. 1 of the House Committee on the Judiciary on S. 1008, 81st Cong., 1st Sess., June 8 and 14, 1949, p. 61.

The Court first condemns the Commission's position that meeting in good faith a competitor's price merely rebuts the prima facie establishment of discrimination based on forbidden differences in sales price, so as to require an affirmative finding by the Commission that nevertheless there may be enjoinable injury under the Robinson-Patman Act to the favored buyer's competitors. The Court then decides that good faith in meeting competition was an absolute defense for price discrimination, saying:

"On the other hand, the proviso is readily understandable as simply continuing in effect a defense which is equally absolute, but more limited in scope than that which existed under § 2 of the original Clayton Act."

Such a conclusion seems erroneous. What follows in this dissent demonstrates, we think, that Congress intended so to amend the Clayton Act that the avenue of escape given price discriminators by its "meeting competition" clause should be narrowed. The Court's interpretation leaves what the seller can do almost as wide open as before. See p. 263 *et seq., infra.* It seems clear to us that the interpretation put upon the clause of the Robinson-Patman Act by the Court means that no real change has been brought about by the amendment.

The public policy of the United States fosters the free-enterprise system of unfettered competition among producers and distributors of goods as the accepted method to put those goods into the hands of all consumers at the least expense.[3] There are, however, statutory exceptions to such unlimited competition.[4] Nondiscriminatory

[3] *Associated Press* v. *United States,* 326 U. S. 1, 13; *United States* v. *Line Material Co.,* 333 U. S. 287, 309.

[4] *E. g.,* Interstate Commerce Act, § 5, 49 U. S. C. § 5; Communications Act of 1934, § 221, 47 U. S. C. § 221; Miller-Tydings Act, 15 U. S. C. § 1. And see Mason, The Current Status of the Monopoly Problem in the United States, 62 Harv. L. Rev. 1265.

pricing tends to weaken competition in that a seller, while otherwise maintaining his prices, cannot meet his antagonist's price to get a single order or customer. But Congress obviously concluded that the greater advantage would accrue by fostering equal access to supplies by competing merchants or other purchasers in the course of business.[5]

The first enactment to put limits on discriminatory selling prices was the Clayton Act in 1914, 38 Stat. 730, § 2. Section 11 enabled the Commission to use its investigatory and regulatory authority to handle price discrimination. Section 2 provided for the maintenance of competition by protecting the ability of business rivals to obtain commodities on equal terms. The Robinson-Patman Act moved further toward this objective. In the margin appear the applicable words of the Clayton Act followed by those of the Robinson-Patman Act. Phrased summarily for this case, it may be said that the italicized words in the Clayton Act were the source of the difficulties in enforcement that Congress undertook to avoid by the italicized words of the Robinson-Patman Act.[6]

---

[5] For a discussion of the merits of the legislation, see Adelman, Effective Competition and the Antitrust Laws, 61 Harv. L. Rev. 1289.

[6] Clayton Act:

"SEC. 2. That it shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities, . . . where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce: Provided, That nothing herein contained shall prevent . . . *discrimination in price in the same or different communities made in good faith to meet competition:* . . . ."

Robinson-Patman Act:

"SEC. 2. (a) That it shall be unlawful for any person engaged in commerce, . . . to discriminate in price between different purchasers of commodities . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, *or to injure, destroy, or prevent competition*

It will be noted that unless the effect is given the Robinson-Patman amendment contended for by the Federal Trade Commission, there is little done to overcome the difficulties arising from the "meeting competition" clause of the Clayton Act. Formerly "discrimination in price in the same or different communities made in good faith to meet competition" was allowed as a complete defense. Now it is "made in good faith to meet an equally low price of a competitor." The Court says:

> "It thus eliminates certain difficulties which arose under the original Clayton Act. For example, it omits reference to discriminations in price 'in the same or different communities . . .' and it thus restricts the proviso to price differentials occurring in actual competition. It also excludes reductions which undercut the 'lower price' of a competitor. None of these changes, however, cut into the actual core of the defense. That still consists of the provision that wherever a lawful lower price of a competitor threatens to deprive a seller of a customer, the seller, to retain that customer, may in good faith meet that lower price."

We see little difference. The seller may still, under the Court's interpretation, discriminate in sales of goods of

---

*with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them:* . . . .

"(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, *the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown,* the Commission is authorized to issue an order terminating the discrimination: Provided, however, *That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

like quantity and quality between buyers on opposite corners, so long as one gets a lower delivered price offer from another seller, no matter where located. The "actual core of the defense" remains intact.

## I.

*Legislative History.* Upon the interpretation of the words and purpose of this last addition by the Robinson-Patman Act to curbs on discrimination in trade, the narrow statutory issues in this case turn. Though narrow, they are important if trade is to have the benefit of careful investigation before regulation, attainable under the Federal Trade Commission Act but so difficult when attempted by prosecutions in courts with the limitations of judicial procedure. As an aid to the interpretation of § 2 (b), we set out applicable parts of its legislative history.

The Clayton Act created a broad exception from control for prices made in good faith to meet competition. This raised problems of which Congress was aware. In reporting on a redrafted version of S. 3154, the Senate's companion bill to the House bill that became the Robinson-Patman Act, the Senate Committee on the Judiciary, February 3, 1936, pointed out the weakness of § 2 of the Clayton Act in permitting discrimination to meet competition, and suggested a harsh remedy, the elimination of its italicized proviso in note 6, *supra,* without the mollifying words of § 2 (b) of the Robinson-Patman Act.[7] In

---

[7] S. Rep. No. 1502, 74th Cong., 2d Sess. 4:

"The weakness of present section 2 lies principally in the fact that: (1) It places no limit upon differentials permissible on account of differences in quantity; and (2) it permits discriminations to meet competition, and thus tends to substitute the remedies of retaliation for those of law, with destructive consequences to the central object of the bill. Liberty to meet competition which can be met only by price cuts at the expense of customers elsewhere, is in its un-

March, the House Committee on the Judiciary made its report on the bill that became the Act. Section 2 (b) was then in substantially its present form. The report pointed out the draftsmen's purpose to strengthen the laws against price discrimination, directly or indirectly through brokerage or other allowances, services or absorptions of costs.[8] It commented that the subsection that became § 2 (b) let a seller "meet the price actually pre-

---

masked effect the liberty to destroy competition by selling locally below cost, a weapon progressively the more destructive in the hands of the more powerful, and most deadly to the competitor of limited resources, whatever his merit and efficiency. While the bill as now reported closes these dangerous loopholes, it leaves the fields of competition free and open to the most efficient, and thus in fact protects them the more securely against inundations of mere power and size.

"Specific phrases of section 2 (a), as now reported, may be noted as follows:

"One:

" '* * * where either or any of the purchases involved in such discrimination are in commerce * * *.'

"Section 2 (a) attaches to competitive relations between a given seller and his several customers, and this clause is designed to extend its scope to discriminations between interstate and intrastate customers, as well as between those purely interstate. Discriminations in excess of sound economic differences involve generally an element of loss, whether only of the necessary minimum of profits or of actual costs, that must·be recouped from the business of customers not granted them. When granted by a given seller to his customers in other States, and denied to those within the State, they involve the use of that interstate commerce to the burden and injury of the latter. When granted to those within the State and denied to those beyond, they involve conversely a directly resulting burden upon interstate commerce with the latter. Both are within the proper and well-recognized power of Congress to suppress."

[8] H. R. Rep. No. 2287, 74th Cong., 2d Sess. 3:

"The purpose of this proposed legislation is to restore, so far as possible, equality of opportunity in business by strengthening antitrust laws and by protecting trade and commerce against unfair trade practices and unlawful price discrimination, and also against restraint and monopoly for the better protection of consumers,

viously offered by a local competitor."[9]   The language
used in regard to competition in the bills and in the Act
seems to have been based on a recommendation of the
Federal Trade Commission.[10]   The Commission had been

workers, and independent producers, manufacturers, merchants, and
other businessmen.

"To accomplish its purpose, the bill amends and strengthens the
Clayton Act by prohibiting discriminations in price between pur-
chasers where such discriminations cannot be shown to be justified
by differences in the cost of manufacture, sale, or delivery resulting
from different methods or quantities in which such commodities are
to such purchasers sold and delivered.   It also prohibits brokerage
allowances except for services actually rendered, and advertising and
other service allowances unless such allowances or services are made
available to all purchasers on proportionally equal terms.   It strikes
at the basing-point method of sale, which lessens competition and
tends to create a monopoly."

[9] *Id.*, p. 16:

"This proviso represents a contraction of an exemption now con-
tained in section 2 of the Clayton Act which permits discriminations
without limit where made in good faith to meet competition.   It
should be noted that while the seller is permitted to meet local com-
petition, it does not permit him to cut local prices until his competi-
tor has first offered lower prices, and then he can go no further than
to meet those prices.   If he goes further, he must do so likewise
with all his other customers, or make himself liable to all of the
penalties of the act, including treble damages.   In other words, the
proviso permits the seller to meet the price actually previously
offered by a local competitor.   It permits him to go no further."

[10] Final Report on the Chain-Store Investigation, S. Doc. No. 4,
74th Cong., 1st Sess. 96: "A simple solution for the uncertainties
and difficulties of enforcement would be to prohibit unfair and un-
just discrimination in price and leave it to the enforcement agency,
subject to review by the courts, to apply that principle to particular
cases and situations.   The soundness of and extent to which the
present provisos would constitute valid defenses would thus become
a judicial and not a legislative matter.

"The Commission therefore recommends that section 2 of the
Clayton Act be amended to read as follows:

" 'It shall be unlawful for any person engaged in commerce, in

unable to restore the desired competition under the Clay-
ton Act, and Congress evidently sought to open the way
for effective action.[11]

Events in the course of the proposed legislation in the
Senate and House have pertinence. The Senate inserted
the original ineffective language of the Clayton Act in
its exact form in the Senate bill. In the same draft it
adopted an amendment similar to the proviso ultimately
enacted. 80 Cong. Rec. 6426, 6435. In the House, Rep-
resentative Patman explained his view of the dangers
in the original proviso.[12] It was taken out in Confer-

---

any transaction in or affecting such commerce, either directly or
indirectly to discriminate unfairly or unjustly in price between dif-
ferent purchasers of commodities, which commodities are sold for
use, consumption, or resale within the United States or any Territory
thereof or the District of Columbia or any insular possession or other
place under the jurisdiction of the United States.' "

This report was utilized by the House Committee dealing with
the proposed Robinson-Patman legislation. H. R. Rep. No. 2287,
74th Cong., 2d Sess. 3, 7.

[11] *Id.*, p. 64: "If the discrimination is 'on account of differences
in the grade, quality, or quantity of the commodity sold', or makes
'only due allowance for difference in the cost of selling or transpor-
tation', or is 'made in good faith to meet competition', it is not unlaw-
ful, even though the effect 'may be to substantially lessen competition
or tend to create a monopoly in any line of commerce.' Discrimi-
natory price concessions given to prevent the loss of a chain store's
business to a competing manufacturer, to prevent it manufacturing
its own goods, or to prevent it from discouraging in its stores the sale
of a given manufacturer's goods, may be strongly urged by the manu-
facturer as 'made in good faith to meet competition.' " See p. 90, *id.*

Attention was called to this need. H. R. Rep. No. 2287, 74th
Cong., 2d Sess. 7: "Some of the difficulties of enforcement of this
section as it stands are pointed out in the [Final Report] of the Fed-
eral Trade Commission above referred to, at pages 63 and following."

[12] 80 Cong. Rec. 8235:

"Mr. Chairman, I would like to ask a question of the gentleman
from Texas [Mr. PATMAN]. A great many of the industries in Ohio

ence.[13] The Chairman of the House managers, Mr. Utterback, before the Conference Report was agreed to by the House, received permission to print an explanation

were very much in favor of the proviso in the Senate bill, appearing on page 4, and reading as follows:

" '*And provided further*, That nothing herein contained shall prevent discrimination in price in the same or different commodities made in good faith to meet competition.'

"I find that on page 9 of the Patman bill, beginning in line 14, there appear these words:

" '*Provided, however*, That nothing herein contained shall prevent a seller rebutting the prima facie case thus made by showing that his lower price to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor.'

"Will the gentleman explain the difference between these two proposals?

"Mr. PATMAN. If the Senate amendment should be adopted it would really destroy the bill. It would permit the corporate chains to go into a local market, cut the price down so low that it would destroy local competitors and make up for their losses in other places where they had already destroyed their competitors. One of the objects of the bill is to get around that phrase and prevent the large corporate chains from selling below cost in certain localities, thus destroying the independent merchants, and making it up at other places where their competitors have already been destroyed. I hope the gentleman will not insist on the Senate amendment, because it would be very destructive of the bill. The phrase 'equally low price' means the corporate chain will have the right to compete with the local merchants. They may meet competition, which is all right, but they cannot cut down the price below cost for the purpose of destroying the local man.

"Mr. COOPER of Ohio. What does the gentleman's proviso mean?

"Mr. PATMAN. It means they may meet competition, but not cut down the price below cost. It means an equally low price but not below that. It permits competition, but it does not permit them to cut the price below cost in order to destroy their competitors. I hope the gentleman will not insist on the Senate amendment."

But see pp. 265 and 266, *infra*.

[13] H. R. Rep. No. 2951, 74th Cong., 2d Sess. 6–7:

"The Senate bill contained a further proviso—

" 'That nothing herein contained shall prevent discrimination in price

of his understanding of the proviso. He explained that the proviso "does not set up the meeting of competition as an absolute bar to a charge of discrimination under the bill. It merely permits it to be shown in evidence. . . . It leaves it a question of fact to be determined in each case, whether the competition to be met was such as to justify the discrimination given, . . . ." The pertinent parts of the statement appear in the margin.[14]

## II.

*Statutory Interpretation.* This résumé of the origin and purpose of the original § 2 of the Clayton Act and

in the same or different communities made in good faith to meet competition.'

"This language is found in existing law, and in the opinion of the conferees is one of the obstacles to enforcement of the present Clayton Act. The Senate receded, and the language is stricken. A provision relating to the question of meeting competition, intended to operate only as a rule of evidence in a proceeding before the Federal Trade Commission, is included in subsection (b) in the conference text as follows:

" '*Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.' "

[14] 80 Cong. Rec. 9418:

"In connection with the above rule as to burden of proof, it is also provided that a seller may show that his lower price was made in good faith to meet an equally low price of a competitor, or that his furnishing of services or facilities was made in good faith to meet those furnished by a competitor. It is to be noted, however, that this does not set up the meeting of competition as an absolute bar to a charge of discrimination under the bill. It merely permits it to be shown in evidence. This provision is entirely procedural. It does not determine substantive rights, liabilities, and duties. They are fixed in the other provisions of the bill. It leaves it a question of fact to be determined in each case, whether the competition to be

the amendments of the Robinson-Patman Act gives a basis for determining the effect of this section in a hearing before the Commission where the charge, as here, that a seller during the same period of time has sold the same commodities to various purchasers at different prices, is admitted, and the defense, the elements of which are likewise admitted, is that the discrimination was made in good faith to meet an equally low price of a competitor. Does meeting in good faith a competitor's price constitute a complete defense under the proviso to § 2 (b)? Or does the fact of good faith reduction in price to a purchaser to meet a competitor's price merely rebut the prima facie establishment of discrimination, arising under the statute from proof of forbidden differences in price,[15] so as to require under § 2 (a) affirmative finding by the Commis-

---

met was such as to justify the discrimination given, as one lying within the limitations laid down by the bill, and whether the way in which the competition was met lies within the latitude allowed by those limitations.

"This procedural provision cannot be construed as a carte blanche exemption to violate the bill so long as a competitor can be shown to have violated it first, nor so long as that competition cannot be met without the use of oppressive discriminations in violation of the obvious intent of the bill.

. . . . .

"If this proviso were construed to permit the showing of a competing offer as an absolute bar to liability for discrimination, then it would nullify the act entirely at the very inception of its enforcement, for in nearly every case mass buyers receive similar discriminations from competing sellers of the same product. One violation of law cannot be permitted to justify another. As in any case of self-defense, while the attack against which the defense is claimed may be shown in evidence, its competency as a bar depends also upon whether it was a legal or illegal attack. A discrimination in violation of this bill is in practical effect a commercial bribe to lure the business of the favored customer away from the competitor, and if one bribe were permitted to justify another the bill would be futile to achieve its plainly intended purposes."

[15] See n. 6, *supra*.

sion that there may be injury to competition? Petitioner asserts that good faith meeting of a competitor's price is a complete defense. The Commission and the Court of Appeals take the opposite position, with which we concur.

This is our reason. The statutory development and the information before Congress concerning the need for strengthening the competitive price provision of the Clayton Act, make clear that the evil dealt with by the proviso of § 2 (b) was the easy avoidance of the prohibition against price discrimination. The control of that evil was an important objective of the Robinson-Patman Act. The debates, the Commission's report and recommendation, and statutory changes show this. The Conference Report and the explanation by one of the managers, Mr. Utterback, are quite definitive upon the point. Because of experience under the Clayton Act, Congress refused to continue its competitive price proviso. Yet adoption of petitioner's position would permit a seller of nationally distributed goods to discriminate in favor of large chain retailers, for the seller could give to the large retailer a price lower than that charged to small retailers, and could then completely justify its discrimination by showing that the large retailer had first obtained the same low price from a local low-cost producer of competitive goods. This is the very type of competition that Congress sought to remedy. To permit this would not seem consonant with the other provisions of the Robinson-Patman Act, strengthening regulatory powers of the Commission in "quantity" sales, special allowances and changing economic conditions.

The structure and wording of the Robinson-Patman Amendment to the Clayton Act also conduce to our conclusion. In the original Clayton Act, § 2 was not divided into subsections. In that statute, § 2 stated the body of the substantive offense, and then listed, in a series of provisos, various circumstances under which discrimi-

nations in price were permissible. Thus the statute provided that discriminations were not illegal if made on account of differences in the grade of the commodity sold, or differences in selling or transportation costs. Listed among these absolute justifications of the Clayton Act appeared the provision that "nothing herein contained shall prevent discrimination in price . . . made in good faith to meet competition." The Robinson-Patman Act, however, made two changes in respect of the "meeting competition" provision, one as to its location, the other in the phrasing. Unlike the original statute, § 2 of the Robinson-Patman Act is divided into two subsections. The first, § 2 (a), retained the statement of substantive offense and the series of provisos treated by the Commission as affording full justifications for price discriminations; § 2 (b) was created to deal with procedural problems in Federal Trade Commission proceedings, specifically to treat the question of burden of proof. In the process of this division, the "meeting competition" provision was separated from the other provisos, set off from the substantive provisions of § 2 (a), and relegated to the position of a proviso to the procedural subsection, § 2 (b). Unless it is believed that this change of position was fortuitous, it can be inferred that Congress meant to curtail the defense of meeting competition when it banished this proviso from the substantive division to the procedural. In the same way, the language changes made by § 2 (b) of the Robinson-Patman Act reflect an intent to diminish the effectiveness of the sweeping defense offered by the Clayton Act's "meeting of competition" proviso. The original provisos in the Clayton Act, and the provisos now appearing in § 2 (a), are worded to make it clear that nothing shall prevent certain price practices, such as price "differentials [making] . . . due allowance for differences in the cost of manufacture . . .," or "price changes . . . in response to chang-

ing conditions affecting the market for . . . the goods concerned . . . ." But in contrast to these provisions, the proviso to § 2 (b) does not provide that nothing "shall prevent" a certain price practice; it provides only that "nothing . . . shall prevent a seller rebutting [a] prima-facie case . . . by showing" a certain price practice—meeting a competitive price. The language thus shifts the focus of the proviso from a matter of substantive defense to a matter of proof. Consistent with each other, these modifications made by the Robinson-Patman Act are also consistent with the intent of Congress expressed in the legislative history.

The Court suggests that former Federal Trade Commission cases decided here have treated the "meeting competition" clause of the Robinson-Patman Act as being an absolute defense, not merely a rebuttal of the discrimination charge requiring further finding by the Commission. Reference is made to *Corn Products Refining Co.* v. *Federal Trade Comm'n,* 324 U. S. 726, and *Federal Trade Comm'n* v. *Staley Mfg. Co.,* 324 U. S. 746. In the *Corn Products* case, dealing with a basing point scheme for delivered prices, this Court merely said at p. 741:

> "The only evidence said to rebut the prima facie case made by proof of the price discriminations was given by witnesses who had no personal knowledge of the transactions, and was limited to statements of each witness's assumption or conclusion that the price discriminations were justified by competition."

And then went on to use the language quoted at p. 244 of the Court's opinion. There was no occasion to consider the effect of a successful rebuttal. As authority for its statement, we there cited the *Staley* case.

That citation included these words at pp. 752–753:

> "Prior to the Robinson-Patman amendments, § 2 of the Clayton Act provided that nothing contained in

it 'shall prevent' discriminations in price 'made in good faith to meet competition.' The change in language of this exception was for the purpose of making the defense a matter of evidence in each case, raising a question of fact as to whether the competition justified the discrimination. See the Conference Report, H. Rep. No. 2951, 74th Cong., 2d Sess., pp. 6–7; see also the statement of Representative Utterbach [*sic*], the Chairman of the House Conference Committee, 80 Cong. Rec. 9418."

After that statement, which it should be noted relies upon Mr. Utterback's interpretation quoted at note 14 of this opinion, the Court in the *Staley* case goes on to say that there was no evidence to show that Staley adopted a lower price to meet an equally low price of a competitor. Again there was no occasion for this Court to meet the present issue. We think our citation in *Staley*, quoted above, shows the then position of this Court.[16]

There are arguments available to support the contrary position. No definite statement appears in the committee reports that "meeting competition" is henceforth to be only a rebuttal of a prima facie case and not a full justification for discrimination in price. The proviso of § 2 (b) can be read as having the same substantive effect as the provisos of § 2 (a). The earlier provisos are treated by the Commission as complete defenses. Perhaps there is an implication favorable to the petitioner's position in Representative Patman's omission to state the Federal Trade Commission interpretation on the floor. See n. 12, *supra*.

---

[16] The Court's opinion in this case refers, p. 244, notes 10 and 11, to the opinions of the Court of Appeals for the Seventh Circuit in *Corn Products* and *Staley*, 144 F. 2d 211 and 221. But that court reversed its position in the opinion below, 173 F. 2d 210, 216. It is fair to assume that reversal was because of our opinions in *Corn Products* and *Staley*.

The underlying congressional purpose to curtail methods of avoiding limitations on price discriminations, however, considered with the more specific matters discussed herein, satisfies us that we should adopt the conclusion of the Commission and the Court of Appeals.[17] We believe that good faith meeting of a competitor's price only rebuts the prima facie case of violation established by showing the price discrimination. Whether the proven price discrimination is of a character that violates § 2 (a) then becomes a matter for the determination of the Commission on a showing that there may be injury to competition.

### III.

*Conclusion.* In view of the Court's ruling, we will not enlarge this dissent by discussing other problems raised by the case. We have said enough to show that we would affirm the decree below in principle, even though we should conclude some amendment might be required in the wording of the order.

THE CHIEF JUSTICE and MR. JUSTICE BLACK join in this dissent.

---

[17] It is hardly necessary to note that the wisdom of the enactment is not for the Commission nor the courts in enforcing the Act. The Commission recently has advised Congress that while "on balance it would be preferable to make the good-faith meeting of competition a complete defense," it "does not strongly urge either view upon the Congress." Hearings before Subcommittee No. 1 of the House Committee on the Judiciary on S. 1008, 81st Cong., 1st Sess., June 8 and 14, 1949, p. 61. Compare *Standard Oil Co.* v. *United States,* 337 U. S. 293, 311. This statement confirmed the Commission's position taken in this case. There were other officials of the Commission who have taken the view adopted by the Court.