# FEDERAL TRADE COMMISSION *v.*
## STANDARD OIL CO.

No. 24.   Argued November 14, 18, 1957.—Decided January 27, 1958.

*Earl E. Pollock* argued the cause for petitioner, *pro hac vice,* by special leave of Court. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Hansen, Earl W. Kintner* and *James E. Corkey.*

*Hammond E. Chaffetz* argued the cause for respondent. With him on the brief were *Weymouth Kirkland, Howard Ellis, W. H. Van Oosterhout, Frederick M. Rowe* and *Thomas E. Sunderland.*

*Cyrus Austin* filed a brief for the National Congress of Petroleum Retailers, Inc., et al., as *amici curiae,* urging reversal.

*William Simon, Robert L. Wald* and *John Bodner, Jr.* for the Empire State Petroleum Association et al. and *Otis H. Ellis* for the National Oil Jobbers Association, Inc., et al. filed a brief, as *amici curiae,* urging affirmance.

Mr. Justice Clark delivered the opinion of the Court.

This case is a sequel to *Standard Oil Co.* v. *Federal Trade Comm'n,* 340 U. S. 231 (1951), wherein the Court held that § 2 (b) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (b), afforded a seller a complete defense to a charge of price discrimination if its lower price was "made in good faith to meet a lawful and equally low price of a competitor." 340 U. S., at 246. We remanded the case with instructions that the Federal Trade Commission make findings on Standard's contention that its discriminatory prices were so made. The subsequent findings are not altogether clear. The Commission, acting on the same record, seemingly does not contest the fact that Standard's deductions were made to meet the equally low prices of its competitors. However, Standard was held not to have acted in good faith, and the § 2 (b) defense precluded, because of the Commission's determination

that Standard's reduced prices were made pursuant to a price system rather than being "the result of departures from a nondiscriminatory price scale." 49 F. T. C. 923, 954. The Court of Appeals found no basis in the record for such a finding and vacated the order of the Commission, holding that Standard's " 'good faith' defense was firmly established." 233 F. 2d 649, 655. In view of our former opinion and the importance of bringing an end to this protracted litigation, we granted certiorari. 352 U. S. 950 (1956). Having concluded that the case turns on a factual issue, decided by the Court of Appeals upon a fair assessment of the record, we affirm the decision below.

The long history of this 17-year-old case may be found both in the original opinion of the Court of Appeals, 173 F. 2d 210, and in the original opinion of this Court, *supra*. The case arose as a companion to similar complaints filed by the Commission against Gulf Oil Company, the Texas Company, and Shell Oil Company. In its petition for certiorari, the Commission stresses the existence of an industry-wide "dual price system," asserting that the decision below would "insulate from attack a price pattern deeply entrenched in the industry—not only in the Detroit area, but also elsewhere in the country." The pendency of the Gulf, Texas, and Shell complaints is mentioned twice, and the Commission states in a footnote that "[p]roceedings thereon have been deferred until the disposition of this case." However, on April 3, 1957, the Commission decided that "it will not now be practicable to try the issues raised" in the companion complaints "irrespective of the final outcome of . . . the matter of *Standard Oil Company*," and dismissed all three of the companion cases. The claim that the asserted dual pricing system was of industry-wide scope is not vital to the Commission's position here, was not alleged in its complaint, and is not

included among its findings; [1] therefore, we limit our consideration of the pricing system contention to Standard alone.

The Commission urges us to examine its 8-volume record of over 5,500 pages and determine if its finding that Standard reduced prices to four "jobbers" [2] pursuant to a pricing system was erroneous, as held by the Court of Appeals.[3] The Commission contends that a § 2 (b) defense is precluded if the reductions were so made. If wrong in this, it maintains that the "good faith" element of a § 2 (b) defense is not made out by showing that competitors employ such a pricing system,[4] and in any

---

[1] The Commission admits that not all of the major suppliers were using the asserted dual price system, stating in its brief that Standard's two largest competitors in the Detroit area, Socony-Vacuum and Sun Oil Company, sold only at the higher tank-wagon price. The Commission findings reveal that those suppliers who did offer a tank-car price to the Standard customers in question were not offering a uniform price: both Shell and the Texas Company, for example, made offers of two cents per gallon off the tank-wagon price, as contrasted with Standard's one-and-one-half-cent reduction.

[2] The particular tag "jobbers" is of no significance here in the light of our affirmance of the Court of Appeals' conclusion that the reductions in price complained of were not made pursuant to a pricing system. Standard's use of the word, while not an accurate description of the economic function performed by the four purchasers, is as consistent with a desire to placate customers to whom Standard was not forced by lower offers to give a reduced price as it would be with any asserted reduction of prices pursuant to a pricing system.

[3] ". . . [W]e are unable to discern any basis for the conclusion that petitioner's prices 'were not the result of departures from a non-discriminatory price scale.' *The record affirmatively demonstrates to the contrary.* Petitioner sold invariably at its uniform tank-wagon price, except when at different times it reduced its price to meet competitive offers in order to retain a customer." *Standard Oil Co.* v. *Federal Trade Comm'n,* 233 F. 2d 649, 654. (Emphasis added.)

[4] This contention falls of its own weight, for the conclusion that the reductions here were not made pursuant to a pricing system

event is negatived by Standard's failure to make a bona fide effort to review its pricing system upon passage of the Robinson-Patman Act.[5]

On the present posture of the case we believe that further review of the evidence is unwarranted. As stated in *Federal Trade Comm'n* v. *American Tobacco Co.,* 274 U. S. 543, 544 (1927), although "[t]he statement of the petition for certiorari that the judgment and opinion below might seriously hinder future administration of the law was grave and sufficiently probable to justify issuance of the writ," it now appears that "[p]roper decision of the controversy depends upon a question of fact," and therefore "we adhere to the usual rule of non-interference where conclusions of Circuit Courts of Appeals depend on appreciation of circumstances which admit of different interpretations." Moreover, in *Universal Camera Corp.*

---

negates the fact assumption underlying the Commission's argument that there is no good faith when one price system is being matched against another. There is no showing or serious contention by the Commission that the offers of Standard's competitors were unlawful. Indeed, the Court of Appeals stated, "[I]n the instant situation there is no finding, no contention and not even a suspicion but that the competing prices which petitioner met were lawful." 233 F. 2d, at 654. The Commission admits that it "did not actually adjudicate the legality of the competing prices which Standard allegedly met . . . ." In the manner of a casual aside, the Commission belatedly suggests now that the competitors' prices were unlawful since they were similar to Standard's reductions and the latter were unlawful because made pursuant to a pricing system. If this be thought sufficient to raise the question, the foundation of the Commission's logic is destroyed by our affirmance of the finding that Standard's reductions were not made pursuant to any price system.

[5] Our disposition eliminates the necessity of considering this last point. Nor need we consider the Commission's claim that the Court of Appeals held the question involved here to be one of law. An examination of the court's statement, 233 F. 2d, at 651, indicates it had reference to the broader issue of Standard's "good faith" under § 2 (b).

v. *Labor Board*, 340 U. S. 474, 491 (1951), we decided that substantiality of evidence on the record as a whole to support agency findings "is a question which Congress has placed in the keeping of the Courts of Appeals. This Court will intervene only in what ought to be the rare instance when the standard appears to have been misapprehended or grossly misapplied." We do no more on the issue of insubstantiality than decide that the Court of Appeals has made a "fair assessment" of the record.[6] That conclusion is strengthened by the fact that the finding made by the Court of Appeals accords with that of the trial examiner, two dissenting members of the Commission, and another panel of the Court of Appeals when the case was first before that court in 1949, all of them being agreed that the prices were reduced in good faith to meet offers of competitors.

Both parties acknowledge that discrimination pursuant to a price system would preclude a finding of "good faith." *Federal Trade Comm'n* v. *A. E. Staley Mfg. Co.*, 324 U. S. 746 (1945); *Federal Trade Comm'n* v. *Cement Institute*, 333 U. S. 683 (1948); *Federal Trade Comm'n* v. *National Lead Co.*, 352 U. S. 419 (1957). The sole question then is one of fact: were Standard's reduced prices to four "jobber" buyers—Citrin-Kolb, Stikeman, Wayne, and Ned's—made pursuant to a pricing system rather than to meet individual competitive situations?

---

[6] *Labor Board* v. *Pittsburgh S. S. Co.*, 340 U. S. 498, 502–503 (1951); see also *Labor Board* v. *American National Ins. Co.*, 343 U. S. 395, 409–410 (1952). Those cases cannot be distinguished from the present one on the basis of the statutes involved. Compare National Labor Relations Act, § 10 (e), 61 Stat. 147, 29 U. S. C. § 160 (e), with Federal Trade Commission Act, § 5 (c) and (d), 52 Stat. 112–113, 15 U. S. C. § 45 (c), (d). In *Universal Camera, supra,* the Court indicated that the review standard established in that case would apply to all instances of court review of agency decisions. 340 U. S., at 488–490.

We have examined the findings of the Commission, which relies most heavily on the fact that no competitors' offers were shown to have been made to Citrin-Kolb, Stikeman, or Wayne prior to the time Standard initially granted them the reduced tank-car price.[7] All three of these "jobbers," however, were granted the tank-car price before the passage of the Robinson-Patman Act in 1936, and the trial examiner excluded proof of pre-1936 offers on the ground of irrelevancy. The Commission approved this ruling, and on remand failed to reopen the record to take any further proof. In our former opinion in this case, we said, "There is no doubt that under the Clayton Act, before its amendment by the Robinson-Patman Act, [such] evidence would have been material and, if accepted, would have established a complete defense to the charge of unlawful discrimination." 340 U. S., at 239–240. The proof should have been admitted; its absence can hardly be relied on by the Commission now as a ground for reversal. In any event, the findings that were made are sufficient for our disposition of the case.

It appears to us that the crucial inquiry is not why reduced prices were first granted to Citrin-Kolb, Stikeman, and Wayne, but rather why the reduced price was continued subsequent to passage of the Act in 1936. The findings show that both major and local suppliers made numerous attempts in the 1936–1941 period to lure these "jobbers" away from Standard with cut-rate prices, often-

---

[7] The Commission brief also claims that reduction pursuant to a pricing system was admitted in the 1940 answer filed by Standard. That portion of the answer referred to, however, was concerned with establishing an alternative and altogether different defense, namely, cost justification on the basis of functional customer classification. Such defense could be argued even if the reductions were held made pursuant to a pricing method, and therefore is consistent with the claim of good faith meeting of competition.

times much lower than the one-and-one-half-cent reduction Standard was giving them.[8]   It is uncontradicted, as pointed out in one of the Commission dissents, that Standard lost three of its seven "jobbers" by not meeting competitors' pirating offers in 1933–1934.   All of this occurred in the context of a major gasoline price war in the Detroit area, created by an extreme overabundance of supply—a setting most unlikely to lend itself to general pricing policies.   The Commission itself stated:

> "It may well be that [Standard] was convinced that if it ceased granting tank-car prices to Citrin-Kolb, Wayne, and Stikeman and continued to refuse the tank-car price to Ned's Auto Supply Company it would lose these accounts.   It had substantial reasons for believing this to be the case, for all of these concerns, except Ned's Auto Supply Company, had already been recognized as entitled to the tank-car price under the commonly accepted standards of the industry, and Ned's had achieved a volume of distribution which brought it within the range where it was likely to be so recognized by a major oil company at any time."   49 F. T. C., at 952–953.

The findings as to Ned's, the only one of the "jobbers" initially to receive the tank-car price *post* Robinson-Patman, are highly significant.   After a prolonged period of haggling, during which Ned's pressured Standard with information as to numerous more attractive price offers made by other suppliers, Standard responded to an ultimatum from Ned's in 1936 with a half-cent-per-gallon reduction from the tank-wagon price.   The

---

[8] The Commission places great importance on the fact that only one of these offers was a standing offer.   This is not a situation involving only one or two competitive raids, however; continuation of reductions once granted is warranted by § 2 (b) when competitors' reduced price offers are recurring again and again in a cutthroat market.

Commission concedes that this first reduction occurred at a time when Ned's did not meet the criteria normally insisted upon by Standard before giving any reduction. Two years later, after a still further period of haggling [9] and another Ned's ultimatum, Standard gave a second reduction of still another cent.

In determining that Standard's prices to these four "jobbers" were reduced as a response to individual competitive situations rather than pursuant to a pricing system, the Court of Appeals considered the factors just mentioned, all of which weigh heavily against the Commission's position. The Commission's own findings thus afford ample witness that a "fair assessment" of the record has been made. Standard's use here of two prices, the lower of which could be obtained under the spur of threats to switch to pirating competitors, is a competitive deterrent far short of the discriminatory pricing of *Staley, Cement,* and *National Lead, supra,* and one which we believe within the sanction of § 2 (b) of the Robinson-Patman Act.

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur, dissenting.

The Court today cripples the enforcement of the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13, in an

---

[9] The findings indicate that similar haggling over an extended period of time occurred before each of the other "jobbers" obtained a reduced price. The great time consumed in the haggling process tends to negate any idea that the participants were only deciding whether a given purchaser met Standard's four well-defined "jobber" criteria— annual volume of one to two million gallons, own delivery facilities, bulk storage capable of taking tank-car delivery, and responsible credit rating.

important area. Section 2 of the Act makes it unlawful for any person engaged in commerce "to discriminate in price between different purchasers of commodities of like grade and quality" where the purchases are in commerce. Section 2 further provides that as proof of a discrimination "the burden of rebutting the *prima-facie* case" shall be on the person charged with the discrimination, provided, however, "That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made *in good faith* to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." (Italics added.)

*First.* Standard admitted that it gave reduced prices to some retailers and refused those reduced prices to other retailers. Before granting these retailers the reduced prices Standard classified them as "jobbers." Standard's definition of a "jobber" took into account the volume of sales of the "jobber," his bulk storage facilities, his delivery equipment, and his credit rating. If Standard's tests were met, the "retailer" became a "jobber" even though he continued to sell at retail. Moreover, Standard's test of who was a "jobber" did not take into account the cost to Standard of making these sales. So Standard's definition of "jobber" was arbitrary, both as respects the matter of *costs* and the matter of *function*. It comes down to this: a big retailer gets one price; a small retailer gets another price. And this occurs at the *ipse dixit* of Standard, not because the cost of serving the big retailer is less nor because the big retailer, as respects the sales in question, performs a function different from any other retailer.

The construction now given the Act flies in the face of the policy expressed by the provisions already quoted and

the words in explanation used by Representative Patman himself:

> "What are the objectives of this bill? Mr. Chairman, there has grown up in this country a policy in business that a few rich, powerful organizations by reason of their size and their ability to coerce and intimidate manufacturers have forced those manufacturers to give them their goods at a lower price than they give to the independent merchants under the same and similar circumstance and for the same quantities of goods. Is that right or wrong? It is wrong. We are attempting to stop it, recognizing the right of the manufacturer to have a different price for a different quantity where there is a difference in the cost of manufacture." 80 Cong. Rec. 8111.

*Second.* It is argued, however, that the discrimination in favor of the big retailers and against the small ones is justified on the ground that Standard did no more than meet competition.

To repeat, Standard has given lower prices to some retailers than to others by labeling the favored retailers as "jobbers," when in fact they are not "jobbers." It seems impossible to justify the statutory burden of showing "good faith" by reliance upon such a plainly deceptive contrivance as that.

The Court concedes that Standard did not meet the burden of proving its good faith if its discriminatory prices were made pursuant to a pricing "system" within the meaning given that term by *Federal Trade Comm'n* v. *Staley Co.*, 324 U. S. 746; *Federal Trade Comm'n* v. *Cement Institute*, 333 U. S. 683; *Federal Trade Comm'n* v. *National Lead Co.*, 352 U. S. 419. The Commission found "the discriminations in price involved in this proceeding were made pursuant to respondent's established

method of pricing." The record amply supports this finding.[1]

If a seller offers a reduced price for no other reason than to meet the lawful low price of a competitor, then the

---

[1] Standard's answer to the complaint admits as much if the conclusory allegations as to Standard's good faith are ignored. Paragraph 17 of the answer alleged:

"Respondent alleges that its general policy and practice of bona fidely selecting and classifying gasoline customers as wholesale or jobber customers, as distinguished from retail resellers, is as follows:

"That such wholesale or jobber customer so classified shall have adequate bulk storage of his own; that he be equipped to receive bulk deliveries by tank car or truck train into such storage; that he have adequate distribution and delivery facilities; that he make tank car purchases in substantial volume and do a continuing substantial volume of business as a bona fide gasoline dealer maintaining and operating an established gasoline business; that he have satisfactory credit rating; that he maintain a sufficient personnel and all requisite facilities and equipment to adequately operate his business, service his customers, and perform his functions as a wholesaler or jobber, and assume the hazard and expense of fully operating his own business.

"Respondent alleges that each of the four customers named in Paragraph Three of the Complaint fully, fairly, and reasonably falls within not only the requirements set forth in Paragraph 17 above but within all fair, reasonable, usual and proper requirements for classification as a wholesaler or jobber, and that each maintains its own adequate bulk storage, delivery tank trucks, salesmen and operating personnel; buys in substantial tank car or truck train lots . . . ."

Moreover, the manager of Standard's Detroit Division, when asked what characteristics a jobber must have to be entitled to the tank car price replied:

"He must have equipment; he must have equipped himself with bulk storage, and, by bulk storage, I mean sufficient storage so that he can take care of tank car quantities of gasoline; he should have a volume of business amounting to about 1,000,000 to 2,000,000 gallons per year; his credit responsibility and so forth must be satisfactory; he should have an established business."

Also, with one exception for a short period, the favored "jobbers" always received the same price.

seller's otherwise unlawful price falls within the protection of § 2 (b). But where, as here, a seller establishes a discriminatory pricing *system,* this system does not acquire the protection of § 2 (b) simply because in fact use of the system holds a customer against a competitive offer. In other words, a discriminatory pricing system which in fact meets competition is not a good-faith meeting of competition within the meaning of the Act. The effectiveness of the system does not demonstrate the good faith of its initiator.

*Third.* The mere fact that a competitor offered the lower price does not mean that Standard can lawfully meet it. Standard's system of price discrimination, shown not to be in "good faith," cannot be justified by showing that competitors were using the same system. "This startling conclusion is admissible only upon the assumption that the statute permits a seller to maintain an otherwise unlawful system of discriminatory prices, merely because he had adopted it in its entirety, as a means of securing the benefits of a like unlawful system maintained by his competitors." *Federal Trade Comm'n* v. *Staley Co., supra,* at 753. See also *Federal Trade Comm'n* v. *Cement Institute, supra,* at 725.

We said in *Standard Oil Co.* v. *Federal Trade Comm'n,* 340 U. S. 231, 250, "Congress meant to permit the natural consequences to follow the seller's action in meeting in good faith a *lawful* and *equally low price* of its competitor." (Italics added.) It is only a *lawful* lower price that may be met. Were it otherwise then the law to govern is not the Robinson-Patman Act but the law of the jungle. The point we have now reached was seen by Congressman Utterback, one of the managers of the bill in conference. What he said should dispose of this case:

> "This procedural provision cannot be construed as a *carte blanche* exemption to violate the bill so long

as a competitor can be shown to have violated it first, nor so long as that competition cannot be met without the use of oppressive discriminations in violation of the obvious intent of the bill.

"To illustrate: The House committee hearings showed a discrimination of 15 cents a box granted by Colgate-Palmolive-Peet Co. on sales of soap to the A. & P. chain. Upon a complaint and hearing before the Federal Trade Commission, this proviso would permit the Colgate Co. to show in rebuttal evidence, if such were the fact, an equally low price made by a local soap manufacturer in Des Moines, Iowa, to A. & P.'s retail outlets in that city; but this would not exonerate it from a discrimination granted to A. & P. everywhere, if otherwise in violation of the bill.

"But the committee hearings show a similar discount of 15 cents a case granted by Procter & Gamble to the same chain. If this proviso were construed to permit the showing of a competing offer as an absolute bar to liability for discrimination, then it would nullify the act entirely at the very inception of its enforcement, for in nearly every case mass buyers receive similar discriminations from competing sellers of the same product. One violation of law cannot be permitted to justify another. As in any case of self-defense, while the attack against which the defense is claimed may be shown in evidence, its competency as a bar depends also upon whether it was a legal or illegal attack. A discrimination in violation of this bill is in practical effect a commercial bribe to lure the business of the favored customer away from the competitor, and if one bribe were permitted to justify another the bill would be futile to achieve its plainly intended purposes." 80 Cong. Rec. 9418. (Italics added.)

When we let Standard classify a "retailer" as a "jobber" and grant a discriminatory price pursuant to arbitrary requirements merely because a competitor employs the same system,[2] we make this provision of the Robinson-Patman Act ineffective. We should read the Act in a more hospitable way and allow Standard to maintain its discriminatory price schedule for retailers if and only if it can show

(a) that that price was justified on the basis of costs or function, or

(b) that it was in good faith meeting the *lawful* offer of a competitor, rather than merely matching a predatory price system, or meeting a competitor's "pirating" offers, to use the Court's word, with a "pirating" system of its own.

I would reverse this judgment and direct enforcement of the Commission's order.

---

[2] The Commission's findings stated:

"In selecting the customers or prospective customers to whom [Standard] will grant the tank-car price on gasoline, the respondent's criterion is now, and for many years has been, that the customer or prospective customer make annual purchases of not less than from one to two million gallons of gasoline, have storage facilities sufficient to accept delivery in tank-car quantities, and have a credit standing assuring payment for large volume purchases. This is the same criterion which for many years has also been applied by the respondent's major competitors, and under it any question of the distributive function performed by the purchaser, that is, whether the purchaser is a retail dealer selling to the public or a wholesaler selling to retail dealers, is wholly immaterial." 49 F. T. C. 923, 953.