D. L. INGRAM and Edwin H. Ingram, dba Ingram Bros. Oil Company, Plaintiffs,

v.

PHILLIPS PETROLEUM COMPANY, Defendant.

Civ. A. No. 6167.

United States District Court
D. New Mexico.

Oct. 4, 1966.

See also D.C., 252 F.Supp. 674.

Rowley, Davis, Hammond & Murphy, Richard F. Rowley, and David L. Norvell, Clovis, N. M., for plaintiffs.

Iden & Johnson, James F. Paulantis and J. J. Monroe, Albuquerque, N. M., and Lewis J. Ottaviani, Phillips Petroleum Co., Bartlesville, Okl., for defendant.

WILLIAM E. DOYLE, Judge.

## MEMORANDUM OPINION AND ORDER

This case is before the Court on an alleged violation of the Robinson-Patman Act, Title 15 U.S.C. § 13. The case was tried to the Court, taken under advisement, and the matter now stands submitted. Inasmuch as there is little dis-

pute concerning the basic facts in the case, formal findings are deemed unnecessary and the pertinent facts as found by the Court will be set forth in this opinion.

The plaintiffs pray for injunctive relief only. Previously, the complaint also alleged a conspiracy to violate the Sherman Act on the part of Phillips Petroleum Company and several other oil companies; now, the Sherman Act claim against Phillips and the other companies has been dismissed and the remaining issue is whether plaintiffs have shown a violation of the Robinson-Patman Act and are entitled to an injunction.

Plaintiffs allege that starting on or about March 1, 1965, and continuing to the date of filing of the complaint and to the date of the trial, the defendant Phillips had sold gasoline at wholesale to jobbers in Parmer County, Texas, and in a portion of Curry County, New Mexico, at prices substantially less than those charged by the defendant to the plaintiffs for products of like grade and quality; that the sales constitute price discrimination and that the effect thereof may be substantially to lessen competition and tend to create a monopoly in the lines of commerce involved and to injure, destroy and prevent competition by plaintiffs with customers of the defendant. Plaintiffs seek a permanent injunction against further price discrimination together with a judgment for costs, including attorneys' fees.

The evidence shows that the plaintiffs operate as a wholesaler, or jobber, for Phillips in the area surrounding Clovis, New Mexico. Clovis is located in the extreme eastern side of New Mexico, just nine miles away from the Texas border. The alleged favored competitor is one Joe Helton, who is also a Phillips jobber, whose principal office and bulk plant are located in Farwell, Texas, a town nine miles east of Clovis, New Mexico. Helton also does business in Texico, Curry County, New Mexico, which adjoins Farwell, Texas. Apparently, the only difference between Texico, New Mexico, and Farwell, Texas, is that the Texas-New Mexico State line separates them. Helton's assigned territory is an area which surrounds Farwell, Texas; whereas, the territory assigned to plaintiffs is the Clovis area. Plaintiffs' territory extends west of Clovis some sixteen miles, south of Clovis seven miles, north of Clovis forty miles, and east of Clovis seven miles.

The surrounding area of both Clovis, New Mexico, and Farwell, Texas, is agricultural in character. The region has an underground water supply which is used for irrigation. This region, which extends for a distance of approximately fifty miles on a north-south plane and fifteen–thirty miles on an east-west plane, is different from the nonirrigated ranch land which is beyond this section.

Jobbers of Phillips are not required to sell within the territory assigned to them although this would appear to be strongly suggested by Phillips, and although they may sell outside of their territories, neither plaintiffs nor Helton appear to make much effort to sell Phillips products outside of the agricultural area which has been described. Apparently this is due to the fact that the sparseness of the population beyond the irrigated sections does not warrant the effort and expense required to make sales and deliveries.

Plaintiffs became a jobber of Phillips on June 1, 1961, and are at the present time a wholesaler of Phillips. How long they will continue in this capacity if they lose this lawsuit is, however, a question. For a long time prior to February, 1965, Helton had purchased gasoline in Farwell for one-half cent less than the price paid by plaintiffs in Clovis. In February of 1965, Phillips reduced its price in Farwell .9 of a cent; again in March, Helton was given a further reduction of .9 of a cent. Prior to that time he had been purchasing regular gasoline for 13.15 cents per gallon, whereas plaintiffs had been paying 13.65 cents per gallon. After the second reduction, Helton's price was 11.35 cents. Subsequently, in May, 1965, there was a one-half cent increase in Farwell and that is the price at the present time. On the

other hand, the regular price to the plaintiffs has been 13.65 cents during the entire period and this differential of 1.8 cents per gallon on regular gasoline is the alleged discrimination which is the basis for the case.

The evidence shows that when plaintiffs learned that Helton's prices had been reduced in March, 1965, they contacted the Phillips district office and demanded relief. They advised Phillips that they could not stay in business with a price differential of this magnitude (at that time it was 2.3 cents per gallon on regular gasoline). The Phillips representatives in Denver were sympathetic and said that they would see what they could do about it. They proceeded to check with the home office in Bartlesville, Oklahoma, and reported back to plaintiffs that if they would document specifically the instances in which customers were transferring their business to Farwell, they would indemnify plaintiffs to the extent of seventy per cent. of the amount necessary to meet the competition. This, however, did not prove to be a practical solution because plaintiffs were apparently unable to obtain specific information.

According to the evidence plaintiffs' business is constituted largely of sales to retail outlets or filling stations. Twenty-five per cent. of their business is to wholesale consumer accounts. These latter are farmers who purchase substantial quantities for the operation of equipment. Plaintiffs' testimony indicates the loss of a few farmer accounts, but no loss of retail accounts and, undoubtedly, there has been no substantial reduction in the volume of the plaintiffs' sales. In any event, the indemnification offer of Phillips was used in only one instance by the plaintiffs.

In both Farwell, Texas, and Clovis, New Mexico, there are normal pump prices for gasoline. These prices are dependent upon the wholesale price to the jobber, and although the oil companies do not fix these pump prices directly, the price at which they sell the gasoline to the jobber governs the pump price in every instance. This is a custom of the business and generally speaking these normal prices are uniform in the particular area. In Clovis, the normal pump price per gallon on regular gasoline is 32.9 cents. This is the basis for the oil companies, including Phillips, to grant a competitive price allowance, called "C.P.A." in the event of a price war, to reimburse part of the loss. The normal pump price is, of course, the basis for determining the C.P.A. When the pump price drops during a price war, the first one cent reduction is shared entirely by the jobber and the retailer. As the pump price continues to decline, the C.P.A. is given so as to guarantee a minimum profit margin of 2.5 cents and 5 cents per gallon to the jobber and dealer respectively.

In Clovis, there has been an almost continuous price war during the past three years. According to the evidence normal pump prices have been charged only forty-two days in 1964, forty-six in 1965 and seventy-five in 1966. At the time of the trial the price of regular gasoline in Clovis was 29.8 cents per gallon. Incident to these price wars Phillips has during the period here in question, that is, from March, 1965 to June, 1966, extended C.P.A. assistance to the plaintiffs on 2,162,209 gallons of regular gasoline for a total allowance of $35,253.85, or 1.6 cents per gallon. Notwithstanding this, plaintiffs' normal profit margin on sales to service stations has been reduced on the average by three-fourths of a cent as a result of these price wars. The price wars apparently start as a result of reduction of prices by the independents. Once these pump prices are lowered, Continental Oil or Shell Oil Company lower their prices. Thereafter, the retail pump prices of the products of the other majors, including Phillips, are reduced to the same level.

Prior to February 1, 1965, there had been frequent price wars in Farwell, Texas. However, in February, 1965 the normal pump price in Farwell was reduced to 29.9 cents per gallon and has been at that level since. Humble Oil Company led this price re-

duction. The other majors, including Phillips, then reduced their prices to their jobbers who in turn reduced their prices and the normal pump price for regular gasoline in Farwell became 29.9 cents. This has continued to be the normal price, and the market in the Farwell area has since remained stable. Thus, when prices are normal, there is a three-cent differential at the pump on regular gasoline sold by retail outlets of the major oil companies as between Farwell, Texas, and Clovis, New Mexico. This, of course, is not the case when Clovis is in the throes of one of its frequent price wars. The position of Phillips is that the State line is also the logical trade boundary. Phillips points out that if the present injunction is granted it will have the effect of extending the Farwell price reductions into New Mexico and that this is contrary to the concept of the entire oil industry; that a state line is a proper boundary. They say that it is customary in the petroleum industry to limit price changes within given states.

It is noteworthy that plaintiffs' income tax returns for the years 1963, 1964, and 1965, which were received in evidence, reveal a substantial decline in profits during 1965. It is inferable that this is due to plaintiffs' narrower profit margin. The evidence does not disclose that plaintiffs have lost any substantial amount of business to favored customer Helton. This may, however, be due to the fact that most of plaintiffs' service station customers actually lease their stations from the plaintiffs. It would appear that plaintiffs have contacted their farm customers and have persuaded them to hold off on any change pending the disposition of this case. Plaintiffs have lost only three or four farm accounts and there is no direct proof that these went to Helton.

Whether the price wars in Clovis are caused by the lower pump price in Farwell, Texas, remains somewhat of a question. It is logical to infer that the service stations in Farwell compete with the service stations in Clovis, and since the residents of Clovis shop in Farwell and vice versa, it is probable that the lower price in Farwell has its effect in terms of the price wars in Clovis. This much can be concluded: that if the normal pump price were reduced to 29.9 cents in Clovis as it was in Farwell, the market in Clovis would stabilize as it did in Farwell and plaintiffs' profit margin resulting from the price wars would return to normal. Thus, the evidence establishes beyond question a price differential between plaintiffs and Helton, and the question is whether this is an unlawful discrimination which entitles plaintiffs to injunctive relief notwithstanding that they have not suffered a heavy loss.

The elements of a violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, are as follows:

1. Price differences between two or more customers of a given seller which amount to a discrimination;

2. A sale involving goods or commodities of like grade and quality;

3. In interstate commerce;

4. For use, consumption, or resale within the United States;

5. Even if each of the above factors is present, a discrimination is not unlawful unless, in addition to the foregoing, its effect may:

   a. Substantially lessen competition in any line of commerce; or

   b. tend to create a monopoly in any line of commerce; or

   c. substantially injure, destroy, or prevent competition:

   (1) with the person who grants the discrimination;

   (2) with any of his customers;

   (3) with the person who knowingly receives the discrimination;

   (4) with any of his customers;

   (5) with the customers of any of them.

See Oppenheim, Unfair Trade Practices 1024 (1950); Central Ice Cream Co. v. Golden Rod Ice Cream Co., N.D.Ill.1960, 184 F.Supp. 312, 318, quoting Zorn &

Feldman, Business Under the New Price Laws 62 (1937).

■ Plaintiffs, of course, have the burden of proving their case in accordance with the requirement of the Act. See Elgin Corporation v. Atlas Building Products Co., 10 Cir. 1958, 251 F.2d 7, 11.

It is element No. 5 that challenges our attention here, there being no real dispute on the question of a difference in price between two or more customers. Whether it is a discriminatory difference does remain a question.

## I.

### WHETHER THE ALLEGED DISCRIMINATORY SALES WERE IN COMMERCE.

■ We recognize that the commerce requirement of the Clayton Act, amended by the Robinson-Patman Act, is somewhat narrower than the commerce requirement in the Sherman Act. The latter comes into play when interstate commerce is affected. See United States v. Women's Sportswear Manufacturers Ass'n, 336 U.S. 460, 69 S.Ct. 714, 93 L. Ed. 805 (1949). The Robinson-Patman Act, on the other hand, requires proof that either or any of the purchases involved in such discrimination are in commerce, and that they be made by a person engaged in commerce in the course of such commerce. This requires the plaintiff to prove more than that the defendant is merely engaged in interstate commerce; he must establish that at least one of the sales involved in the alleged discrimination occurred in interstate commerce. Central Ice Cream Co. v. Golden Rod Ice Cream Co., supra; affirmed 7 Cir. 1961, 287 F.2d 265, 267; Willard Dairy Corp. v. National Dairy Products Corp., 6 Cir. 1962, 309 F.2d 943, cert. denied 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691.

There has been some question as to whether these sales were made in interstate commerce. The plaintiffs neglected to prove that their supplies originated in Texas, although there was informal mention of it from time to time. Since this appeared to have been assumed by the parties, the Court requested that there be a stipulation as to the origin of the gasoline which was sold to the plaintiffs. The parties have now stipulated as follows:

"Phillips Petroleum Company without waiving objections to the Court's reopening of the case for additional evidence and without stipulating that the sales of gasoline by Phillips Petroleum Company to plaintiff were made in interstate commerce, agrees that the witnesses testifying at the trial would have testified, had they been so interrogated, that during the period covered by the complaint, i. e. March 1, 1965, through May 10, 1965 (Paragraph 16 of the complaint) the plaintiff purchased 23,140 gallons of gasoline from Phillips Petroleum Company in Lubbock, Texas; said gasoline after delivery by Phillips Petroleum Company to plaintiff was transported by plaintiff in its trucks from Lubbock, Texas to New Mexico.

"During the same period of time the plaintiff purchased gasoline from Phillips Petroleum Company at Tucumcari, New Mexico. Said gasoline was obtained by plaintiff at a terminal located at Tucumcari, New Mexico, which terminal was owned and controlled by Shamrock Oil & Gas Corporation and was on a pipe line owned jointly by Shamrock Oil & Gas Corporation, Texaco, Inc. and Phillips Petroleum Company. Said pipe line originating in the State of Texas and terminating at Albuquerque, New Mexico."

■ We conclude that the sales from Phillips to plaintiffs were in fact and in law in interstate commerce and that the commerce requirement of the Act is fully satisfied.

## II.

### WHETHER THE PRICE DIFFERENCE AT BAR CAN BE SAID TO HAVE HAD AN ADVERSE COMPETITIVE EFFECT.

Defendant argues that the evidence fails to establish that the plaintiffs and

Helton are in competition. They say that the plaintiffs and Helton are not adversaries in the re-sale market where purchasers of the products which they buy from defendant are sold.

We note that this case involves an alleged discrimination at the so-called secondary line level, that is, between purchasers of an allegedly discriminating seller. In such cases a state of competition between the purchasers is essential to actionable price discrimation. Atlas Building Products Co. v. Diamond Block & Gravel Co., 10 Cir. 1959, 269 F.2d 950, 954. The plaintiffs and Helton are within the same class. They are wholesalers, are jobbers, and they sell identical products to the same types of customers and so there is no basis for distinction or discrimination between them on the ground that they serve different functions. See Chicago Sugar Co. v. American Sugar Refining Co., 7 Cir. 1949, 176 F.2d 1, 10. Moreover, despite the fact that defendant maintains that they operate in different market areas, we are of the opinion that the Texas-New Mexico state line does not in this instance constitute a trade boundary which separates different trade areas. As a matter of fact, part of Helton's territory is in New Mexico. As previously noted, the towns of Clovis, New Mexico, and Farwell, Texas, are geographically close, and the area is a single homogeneous economic unit held together by its charcter as agricultural land. The natural barriers are the sand hills and pasture lands that lie beyond the boundary of this agricultural area served by underground water. The evidence shows that both the plaintiffs and Helton sell gasoline outside the territories prescribed to them. The farmers shop in both towns and patronize businesses in both places. In view of these facts, we are constrained to conclude that the plaintiffs and Helton are in practical competition.

### III.

### WHETHER THE EVIDENCE ESTABLISHES THAT COMPETITION HAS BEEN SUBSTANTIALLY LESSENED, INJURED, DESTROYED OR PREVENTED.

Defendant's position as to the deficiency of the plaintiffs' proof with respect to injury to competition is that plaintiffs' volume has continued good despite the price difference. Plaintiffs have not been required to lower their prices in order to prevent loss of sales. This, however, does not constitute evidence of lack of substantial injury to competition. See Standard Motor Products, Inc. v. Federal Trade Commission, 2 Cir. 1959, 265 F.2d 674, cert. denied 361 U.S. 826, 80 S.Ct. 73, 4 L.Ed.2d 69; E. Edelmann & Co. v. Federal Trade Commission, 7 Cir. 1956, 239 F.2d 152, cert. denied 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed. 2d 422; Moog Industries, Inc. v. Federal Trade Commission, 8 Cir. 1956, 238 F.2d 43. In *Standard Motor Products,* supra, discounts were given by an automobile equipment manufacturer to its distributors. Discounts given to certain large distributors and those who were members of cooperative buying groups were larger than those received by the small distributors who were unaffiliated. On the other hand, the distributors sold the equipment at the manufacturer's resale price and there was no evidence of loss of sales. Nevertheless, the Court said that competitive injury was to be inferred from the discount differentials in the light of the narrow profit margins and the competition in the industry. Thus, it was the loss of profits rather than the loss of sales that was regarded as injurious. The smaller distributors were forced to join cooperative buying groups so as to obtain higher discounts. The Court said that this could "tend only to further lessen competition."

The plaintiffs have suffered narrower profit margins and a reduction in profits during the year 1965. To be sure, there has been some offsetting compensation as a result of the C.P.A.

which plaintiffs received from the defendant. However, this assistance is only given during price wars; the price differential between plaintiff and Helton is continuous. Moreover, it cannot be said that the price wars at Clovis are not related at least in part, to the lower normal price charged in Farwell. There is some evidence that retail buyers driving east from Clovis buy a small quantity of gasoline, enough to take them to Farwell, where they can buy it cheaper. The plaintiffs have made no measurable showing of money damages; however, it cannot be said that there is not some competitive injury which results from the price differential in this case.

## IV.

### WHETHER PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF WHERE THERE HAS BEEN NO MEASURABLE SHOWING OF MONEY DAMAGES.

The ultimate question here is whether the evidence establishes a reasonable possibility of substantial injury in the future. In Standard Oil Co. v. Federal Trade Commission, 7 Cir. 1945, 173 F.2d 210, at page 216, the Court said:

"[I]n the instant case, the Commission went further and showed that the petitioner's discrimination in price to its wholesale customers did have the effect to substantially lessen competition or to injure, destroy, or prevent competition. Note, however, that it would have been necessary for the Commission to prove only that such discrimination in price *may* have that effect. Federal Trade Commission v. Morton Salt Company, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196. It is not actual injury alone but the prospect reasonably to be expected of injury to competition which the statute seeks to prevent."

■ Injunctive relief is granted for the purpose of preventing threatened injury. General equitable principles governing the granting of relief in other equity cases apply to the so-called trade cases. United States v. Radio Corpora-

tion of America, D.C.Del.1942, 46 F. Supp. 654; Title 15 U.S.C. § 26. Furthermore, actual damages are not a prerequisite to the granting of injunctive relief. Mid-West Theatres Co. v. Cooperative Theatres, E.D.Mich.1941, 43 F. Supp. 216, 224; Continental Baking Co. v. Utah Pie Co., 10 Cir.1965, 349 F.2d 122, 148, 149, cert. granted 382 U.S. 914, 86 S.Ct. 288, 15 L.Ed.2d 230, 1965. In *Continental Baking*, the Court noted that a reasonable possibility is more than a mere possibility.

■ We conclude that plaintiffs' future is much bleaker than is their past and present. The evidence shows that they have persuaded their accounts to await the outcome of this action. It is not reasonable to suppose, however, that these people will continue to buy from plaintiffs at the higher price when they can obtain the identical product from Helton at a substantially lower price. The price differential here of 1.8 cents per gallon is sufficiently substantial so that it cannot be regarded as *de minimis*. Therefore, we conclude that there exists a reasonable possibility that the lower price in the market area in suit will substantially lessen competition or tend to create a monopoly or prevent competition with the person who received the benefit thereof. We further note that plaintiffs do not have an adequate remedy at law. We further conclude that the threatened injury is something more than trivial or sporadic interference with competition. See Minneapolis-Honeywell Regulator Co. v. Federal Trade Commission, 7 Cir. 1951, 191 F.2d 786, cert. dismissed 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245, 1952.

## V.

### WHETHER DEFENDANT MAY AVAIL ITSELF OF THE AFFIRMATIVE DEFENSE PROVIDED BY SECTION 2(b) OF THE ACT, TITLE 15 U.S.C. SECTION 13(b).

■ Defendant finally contends that the price difference here shown is within the exception recognized by the Act

as a price made in good faith to meet an equally lower price made in good faith to meet an equally lower price of a competitor. If applicable, the § 2(b) provision of the Act is an absolute bar to the granting of relief even though price discrimination injurious to competition has been shown. Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239, 1951.

It is probable that the price reductions by the independents caused the majors to reduce their prices in Farwell, Texas, during early 1965. It is also clear from the evidence that the defendant Phillips reduced its price following the lead of Humble Oil Company, Texaco and Shell Oil Company. Defendant's prices were reduced after the reduction of the prices of the named companies had been reported in the Oil Daily and had been verified by the defendant. There is some evidence that for a time at least the defendant's prices were lower than those of the competitors, but on the whole they were at the same level.

The contention of plaintiffs that defendant's price reductions were made pursuant to an established pricing system rather than a competitive demand, has merit. If it was pursuant to a pricing system it was not made in genuine response to an individual competitive demand. Federal Trade Commission v. Standard Oil Co., 355 U.S. 396, 401, 78 S.Ct. 369, 2 L.Ed.2d 359; Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010; Federal Trade Commission v. A. E. Staley Manufacturing Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338.

We are of the opinion that the defendant's price reduction was more a part of a customary industry pricing system than an individual meeting of competition. The evidence here shows that in the oil industry pump prices are the result of wholesale prices charged by the major oil companies. In the instant case Humble reduced its price in Farwell, Texas, and the other majors, including the defendant, quickly and automatically followed this lead. Undoubtedly, the retail market had some effect upon this but it is the *system* which is the predominant factor in the price change. Phillips reduced its price in Farwell not to meet any specific competition, but rather because Humble, Texaco and Shell reduced their prices. There was no bargaining and haggling such as that described in Standard Oil Co. v. Federal Trade Commission, 7 Cir. 1956, 233 F.2d 649, 654. Phillips swiftly and unthinkingly responded to the reduced prices. This was the conscious parallelism system at work. We conclude that this conduct was arbitrary and without regard to any specific competitive demand; rather, it was in accordance with an established method of pricing. Thus it does not fulfill the requirements of Section 2(b) of the Act. Therefore, the 2(b) "good faith" defense must be ruled out.

It is concluded that the plaintiffs have made out a case which entitles them to the injunctive relief which they seek. Therefore, counsel for plaintiffs are directed to prepare appropriate judgment for signature of the Court. The entry of judgment is postponed until the formal judgment is signed and entered.